FEDERAL DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

THE LAW OFFICE OF YIFEI HE, PLLC

Plaintiff,

v.

AFTERNIC SERVICES, LLC

Defendant.                                                CIV. NO.   25-10526

COMPLAINT AND JURY DEMAND

Plaintiff, The Law Office of Yifei He, PLLC ("YHE PLLC"), demands judgment against

Defendant, Afternic Services, LLC ("Afternic"), and for its causes of action states as follows:

INTRODUCTION

1.      Afternic is a purveyor of Internet domain names. As described by Afternic itself:

Afternic is a domain marketplace, listing more than five million premium domain names

available for sale and receiving more than 75 million domain searches each month. The company

offers technologies like Fast Transfer that allow a domain buyer to have immediate control of a

purchased domain, and building a distribution network that includes more than 100 partners that

market its domain listings the world over. https://www.cbinsights.com/company/afternic.

2.      According to Afternic's website, Afternic has "affiliate partners," such as

GoDaddy. Upon information and belief, Afternic is a wholly owned subsidiary of GoDaddy.

3.      YHE PLLC (the registrant) registered its domain name, yifeihelaw.com (its

"Distinctive and Valuable Mark"), with GoDaddy (the registrar) in 2017. YHE PLLC used the

domain name to direct traffic to its website which was hosted by Cloudflare. YHE PLLC

annually renewed its domain registration with Godaddy. As a matter of fact, YHE PLLC renewed

its annual domain registration with Godaddy as recently as August 3, 2024. **EXHIBIT A**

4.      The domain name was the Law Office of Yifei He PLLC's business identifier. In this way, YHE PLLC's domain name was critically important to offering its professional services on the Internet. "The importance of having one's recognized trademark as a domain name stems from the fact that many Internet users, when looking for a company's Web site, may simply infer the Web site's address by extrapolating from the company's recognized trademark." *Sallen v. Corinthians Licenciamentos, LTDA*, 273 F.3d 14. 19 (1st Cir. 2001).

5.      From its inception until December 10, 2024, YHE PLLC built its business using its domain name yifeihelaw.com. YHE PLLC's business identifier was widely known as YHE PLLC is licensed to practice law in Massachusetts, Connecticut, and New York as well as Federally across the United States.

6.      On December 10, 2024, without any agreement or authorization whatsoever, Afternic without any notice, confirmation or verification took ownership and/or possession of YHE PLLC's domain name and enabled it to be sold to what appears to be an Indonesian gambling entity ("Infringing Deceptive Domain"). If you go to yifeihelaw.com today, it brings you to an Indonesian gambling website.

7.      YHE PLLC did not allow its domain name yifeihelaw.com to expire nor did it any take any action that could have caused its domain name to be listed for sale on Afternic.

8.      The disastrous effect of the unauthorized misappropriation, conversion, and sale of YHE PLLC's domain name has been exacerbated by Afternic's continued misconduct. Without any evidence, and at all relevant times, Afternic insisted that YHE PLLC listed the domain name for sale. Afternic has refused to take any steps to correct its actions. Despite repeated pleas, Afternic has not provided (because it cannot) any evidence that YHE PLLC

entered into any agreement or provided any authorization to Afternic for the sale of its domain name. Afternic was not authorized to hack into or otherwise access YHE PLLC's account.

## PARTIES

9.      YHE PLLC is a domestic limited liability company organized in New York since July 11, 2019. Its principal place of business is 32 Broadway, Suite 1710, New York NY 10004.

10.      Upon information and belief, Afternic is a Delaware LLC, with its headquarters at with its headquarters at 225 Wyman Street, Waltham, Massachusetts 02451, and has other offices in Massachusetts.

## JURISDICTION AND VENUE

11.      This Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1331.

12.      This Court has supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367(a).

13.      The Court has personal jurisdiction over Afternic as it is located, domiciled, does business in, and is otherwise found in Massachusetts.

14.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because it is where both parties reside.

## FACTS COMMON TO ALL COUNTS

15.      YHE PLLC is a licensed law firm practicing immigration and criminal defense law. It registered its domain name yifeihelaw.com with GoDaddy in 2017.

16.      YHE PLLC used the domain name to host its website, which was hosted by Cloudflare. Thus, anyone looking for YHE PLLC could click on yifeihelaw.com and would be

directed to YHE PLLC's website wherein it could inquire about legal services offered by YHE PLLC.

17.     Since its founding, YHE PLLC was focused on being extremely technologically driven. YHE PLLC focused on marketing directly to consumers looking to find lawyers on the internet. Anyone looking for help in the areas of immigration law and criminal defense could click on www.yifeihelaw.com. They would then be directed to YHE PLLC's website, wherein they could inquire further about professional legal services. Its strategy was successful. In 2023 alone, YHE PLLC reported revenues in excess of half a million dollars.

18.     On or about March 9, 2021, YHE PLLC received an email from Afternic stating: You are receiving this email since you recently listed a domain for sale on GoDaddy or you previously created a GoDaddy Premium Domain Listing. A new Afternic account has been created for you and any GoDaddy Premium Listings you've previously created have been migrated over to your new Afternic account. GoDaddy Premium Listings is being retired. *See* **Exhibit B**, attached hereto.

19.      YHE PLLC did not know who Afternic was at the time. Nevertheless, YHE PLLC never authorized yifeihelaw.com for sale with Afternic. Not one email from Afternic asked for opt-in permission for yifeihelaw.com. Nor did YHE PLLC ever get a confirmation that yifeihelaw.com was listed with Afternic. This is unsurprising as YHE PLLC never offered its domain name, yifeihelaw.com, for sale with Afternic.

20.     On December 10, 2024, YHE PLLC without any warning whatsoever received an email from "ta@afternic.com" informing YHE PLLC that its domain name, yifeihelaw.com, was sold via "Afternic's Fast Transfer network" for $774. Upon information and belief, the "ta" stands for transfer assistance. See **Exhibit C**

21.     This was the first time YHE PLLC ever heard of "Afternic's Fast Transfer network."

22.     According to Afternic's website, to participate in the "Fast Transfer network," a registrant is informed: you will receive 2 emails. One from Afternic - confirming the listing has been added to your account and a second one from your Registrar - containing a link to opt-in your domain into the Fast-Transfer network. See **Exhibit D**

23.     YHE PLLC never received an email from Afternic confirming yifeihelaw.com has been added to his account. YHE also never opted into the Fast-Transfer network for yifeihelaw.com.

24.     Indeed, the Fast Transfer program is a separate agreement which a registrant is required to agree to. The "Fast Transfer Terms of Service for Afternic Sellers" provides: By offering one or more domain names that seller owns for sale via Fast Transfer (each, a "Listed Domain"), seller signifies its agreement to the applicable Fast Transfer Terms of Service in addition to our Membership Agreement, available at: http://www.afternic.com/legal#membership_agreement, and incorporated herein by reference. See **Exhibit E**

25.     YHE PLLC never offered yifeihelaw.com for sale with Afternic, and thus YHE PLLC never signified its agreement to the Fast Transfer Terms of Service or to its Membership Agreement as it related to yifeihelaw.com. Thus, there is no agreement between Afternic and YHE PLLC that would limit in any way the claims that YHE PLLC has against Afternic or that would otherwise limit this Court's jurisdiction.

26.     In addition, under the heading "Prerequisites to Use Fast Transfer Process," to participate in a Fast Transfer, a registrant must also provide a "buy now" price and enroll in and accept the terms of Afternic's DLS Premium Promotion service. See **Exhibit F**

27.     YHE PLLC did not provide a "buy now" price nor did it enroll in or accept the terms of Afternic's DLS Premium Promotion. This is additional evidence that YHE PLLC did not list yifeihelaw.com for sale.

28.     Another way to look at what transpired is to think of YHE PLLC's domain names as a car parked in a garage. If a car dealer, Afternic, affiliated with the garage, Godaddy, takes possession of and sells a car that is wholly owned by YHE PLLC, the dealer, Afternic cannot later say, "I had authorization to sell your car," because the authorization given by YHE PLLC was solely for parking the vehicle in Godaddy's garage. YHE PLLC never gave authorization for a distinct and separate dealer to take possession of and convert his vehicle.

29.     Here and using the above analogy, Afternic, upon information and belief, accessed without any authorization whatsoever YHE PLLC's GoDaddy account (the garage), took possession of yifeihelaw.com (the car) and sold and transferred the domain name to an unknown entity. Afternic was not authorized to hack into or otherwise access YHE PLLC's account to take possession of the domain name, yifeihelaw.com.

30.     Shocked that its domain name was sold without its agreement or authorization and, frankly, in a panic about the sale of its domain name, which essentially shut down its business, on December 10, 2024, YHE PLLC called Afternic and spoke with their representative to explain that yifeihelaw.com was never offered for sale.

31.     After Afternic tried to convince YHE PLLC that it had listed yifeihelaw.com, YHE PLLC scoured its accounts and emails, and found no evidence whatsoever that anyone from YHE PLLC ever listed its domain name for sale on Afternic.

32.     Nevertheless, Afternic later wrote to YHE PLLC that it did offer the domain name for sale. Specifically, Afternic  wrote: Our records indicate that this domain name was sold through your Afternic via a listing created under your account on March 9, 2021. The domain name has been opted in by the domain owner to the Fast Transfer Premium Netowork. The authorization has been completed on the same date, March 9, 2021. **Exhibit G**

33.     At all relevant times, Afternic continued to insist that YHE PLLC listed yifeihelaw.com for sale. After numerous emails back and forth, Afternic sent another email on December 16, 2024, claiming that YHE PLLC first listed yifeihelaw.com for sale with Godaddy on May 31, 2018. **Exhibit H**

34.     Afternic's representations were false and intentionally deceptive. Any authorization that might have been given to Godaddy back in 2018 did not extend to Afternic selling the domain via their Fast transfer network on December 10, 2024. A fact, which Afternic knew or should have known.

35.     In the same email, Afternic informed YHE PLLC he can view a receipt for the domain listing with Godaddy under order number 1316423756. However, prior to December 10, 2024, no such receipt under the referenced order number existed. **Exhibit I**

36.     Still desperate for answers, YHE PLLC continued to try to get an honest answer about how its domain name could have been sold without its authorization or agreement.

37.     YHE PLLC has repeatedly requested that Afternic provide evidence that YHE PLLC listed yifeihelaw.com for sale through Afternic's Fast Transfer program. It has received none.

38.     Prior to its domain name being sold by Afternic, YHE PLLC was held in high esteem by both its customers and its peers. YHE PLLC held various leadership positions with various professional associations including the American Immigration Lawyers Association. YHE PLLC has been invited to speak at various Continuing Legal Education Events. Particularly those related to technological adaption in an aging industry and the creation of the new model for other law firms to follow for years to come.

39.     Much like other frontier-striving businesses and pioneers, YHE PLLC not only created the frontier, but YHE PLLC was the best at it and was often copied for what it created. At the time the Event occurred, YHE PLLC was getting ready to further expand its SEO strategy to reach and solve the problems of even more consumers in multiple jurisdictions across the United States.

40.     Years' worth of effort and success was destroyed on the SEO side of YHE PLLC's business. The Event destroyed YHE PLLC's digital brand on Google's Search platform and tarnished all SEO credibility YHE PLLC had built. In addition, due to Afternic's actions, YHE PLLC lost its ability to (1) fully utilize the strength of its SEO and YHE PLLC website to retain new clients and increase overall firm revenues; (2) piggyback upon its SEO strength to secure paid legal consultations; and (3) function and plan as a business under regular operating conditions.

41.     The sale of its domain name harmed YHE PLLC not only from a SEO standpoint, but also from a professional standpoint. YHE PLLC has since lost access to its email

info@yifeihelaw.com, which was inextricably tied to its domain. As such, YHE PLLC used its

ability to communicate with both its customers and its colleagues. Simultaneously, the loss of its

email address has exposed YHE PLLC to a litany of professional malpractice claims resulting

from YHE PLLC's inability to receive time sensitive correspondences from Courts and Agencies.

      42.    YHE PLLC is not the only company or individual to suffer an unauthorized

transfer of its domain name. Others too have complained. See

https://www.trustpilot.com/users/57e2699a0000ff000a4662c6 (November 15, 2021, ("GoDaddy

seems to auctioned off a domain without my permission. This review is based on the experience

with GoDaddy Auctions and their domain selling partner Afternic. A long time ago I listed a

domain for sale at the GoDaddy Auctions site. The domain name was xxx.com. (the domain

name is hidden). I set the minimum bid to $2000 and the auction type as offer/counteroffer.

Yesterday I got a e-mail from Afternic telling me that "Congratulations! Your domain, xxx.com,

has sold via Afternic's Fast Transfer network for $50.00." Afternic?, fast transfer??, $50?? . What

is this? I checked my GoDaddy auction site and the domain xxx.com was still listed there, with

85 days to go. I also checked my regular GoDaddy account, where I did not find the domain in

the domain overview. I then go to Afternic.com. I have never visited this domain before. Afternic

seems to be an auction partner with GoDaddy. The login looks like GoDaddys, so I try a

password reset with my GoDaddy e-mail account. When I finally manage to login to the Afternic

site I see that there are multiple domains for sale by me (these are all listed at GoDaddy

Auctions), all with a Buy Now price of $50. At GoDaddy Auctions they are all listed from $1000

and up. The account at Afternic stated that I have been a member since September 4, 2021. It

seems like the account is autogenerated and these domains has been added for sale without my

knowledge. Now the domain name seems to be lost, forever. That is also my 20 years customer

relationship with GoDaddy.") ; https://www.trustpilot.com/reviews/627c11a5f03a9893e98acba2

(May 11, 2022, "Afternic is trying to sell our domains without asking us if we want to sell them.

Very dubious organization"); https://www.trustpilot.com/review/afternic.com (June 4, 2022,

"Afternic stole my domain, but did not return it after handing it over to them. No one will trade

through afternic"); https://www.trustpilot.com/review/afternic.com (November 4, 2021. "SCAM

BE WARNED...Said my domain was somehow 'SOLD' by them although I have no account and

have never authorised the sale to anyone or heard of 'Afternic.' I repeatedly asked for bonafides -

NONE FORTHCOMING. They need to be shut down IMMEDIATELY.").

43.    Both Afternic and its Affiliate Godaddy has refused to assist YHE PLLC in

obtaining the return of its domain name, which they could have done. Upon information and

belief, on-line gambling is illegal in Indonesia. Under such circumstances, GoDaddy has the

ability and the right to: Without limiting any of the rights set forth elsewhere in this Agreement,

GoDaddy expressly reserves the right to deny, cancel, terminate, suspend, or limit future access

to this Site or any Services (including but not limited to the right to cancel or transfer any domain

name registration) to any User (i) whose Account or Services were previously terminated or

suspended, whether due to breach of this or any other Agreement or any GoDaddy policy, or (ii)

who otherwise engages or has engaged in inappropriate or unlawful activity while utilizing the

Site or Services (as determined by GoDaddy in its sole and absolute discretion).

https://www.godaddy.com/legal/agreements/universal-terms-of-service-agreement.

44.    YHE PLLC filed a Complaint with the FBI.

45.    YHE PLLC has sought to buy back its domain name.

46.    YHE PLLC has filed a Complaint with ICANN.

47.     Currently, the identity of the purported "new owner" of the Infringing Deceptive Domain is being kept secret and confidential.

48.     Afternic has failed to take steps to investigate and respond appropriately to any reports of abuse as required by the ICANN Registrar Accreditation Agreement ("RAA").

49.     Despite having filed a complaint with GoDaddy and despite YHE PLLC having sent demand letters to both GoDaddy and Afternic, demanding the return of its domain name, Afternic has sought and continues to seek to bully YHE PLLC into accepting the funds for the unauthorized sale of its domain name. **See Exhibit J**

COUNT I

(Violation of 18 U.S.C. § 1030 ("CFAA"))

50.     Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

51.     As described above in detail, Afternic requires a specific authorization to sell a domain name. Without such authority, Afternic cannot break into an account and list and then sell that domain name. Here, Afternic was not granted access to YHE PLLC's account. YHE PLLC's account was therefore off limits to Afternic. As such, Afternic essentially hacked into or otherwise accessed YHE PLLC's account without any authorization.

52.     Title 18, §1030 is entitled "Fraud and related activity in connection with computers," commonly known at the Computer Fraud and Abuse Act ("CFAA").

53.     A private cause of action is provided for under CFAA at § 1030(c).

54.     Afternic intentionally accessed a computer without authorization and thereby obtained information from a protected computer that involved interstate or foreign communications.

55.     Afternic knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct intentionally caused damage without authorization, to a protected computer.

56.     Afternic intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage.

57.     A web-based account satisfies the definition of a computer. The CFAA defines a computer as a high-speed data processing device and includes "any data storage facility or communications facility directly related to or operating in conjunction with" "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions." Id. at § 1030(e)(1). In order for a website to access the Internet, it must access the host server. Accounts, such as YHE PLLC's GoDaddy account, are stored and hosted on a "data storage facility or communications facility directly related to or operating in conjunction with" a computer as defined in the CFAA. § 1030(e)(1).

58.     When Afternic hacked into or otherwise accessed and altered YHE PLLC's GoDaddy account in order to list and sell yifeihelaw.com through its Fast Transfer program, Afternic accessed a computer as defined in CFAA.

59.     As a result of Afternic's action, YHE PLLC suffered an impairment to the integrity and availability of its data, its program, its system, and its information.

60.     As a result of Afternic's actions in violation of CFAA, YHE PLLC suffered damage including destruction, corruption, or deletion of electronic files, and diminution in the completeness or usability of the data on its computer system.

61.     As a result of Afternic's actions in violation of CFAA, YHE PLLC has suffered significant losses and damages in excess of $5,000 which occurred within a one-year period.

62.     YHE PLLC has suffered losses and damages from lost revenue, costs incurred and other consequential damages which it incurred because of Afternic's actions and interruption of services including without limitation:

a. SEO Losses and Damages: yifeihelaw.com received 100% of its new website visits from non-paid Organic Search Engine Optimized website traffic. They achieved this traffic through extensive work building out content on their website, 132 unique pages of content, in a way that appealed to the search engine algorithms through search engine optimization to position their site at the top of the search results pages. Further, based on the keywords that they ranked for, it is clear that the traffic that they received was highly targeted traffic specific to the legal industry. The data also shows that, if YHE PLLC wanted to recreate the same level of website traffic through paid advertising, it would cost them an average of $4,000 per month to buy a similar level of traffic that they were previously receiving through non-paid search engine results. The URL is essentially a piece of land in an up-and-coming neighborhood and the website is a house that you build on top of the land that you're continuously improving in a neighborhood that is also continuously improving. Losing the URL is similar to having to move your house out of the up-and-coming neighborhood and having to start over in an unknown neighborhood and work to build up the value again. Yes, you still have the house (website), but it is now being built in the middle of nowhere and you have to take the time and effort to build the visibility up again. In determining the cost to recreate the previous website's SEO value, it is important to understand that a URL, when used properly for SEO purposes, gains value over time. As new, search friendly content is added to the URL the site continues to rank for new keyword categories and gains additional visibility across the web. The

longer the URL has been active, the more likely it will be to hold search ranking. YHE PLLC no longer has access to the content that was on their prior URL. However, even if it did have access to the content, YHE PLLC would still need to recreate that content in a way that would be unique from the previous website's content, in the eyes of the search engine. It is widely accepted in the SEO industry that Google will penalize you for using duplicate content and that only new and unique content will give you the best opportunity to rank in search results pages. Google may see the content on the new URL as duplicate content in the eyes of their algorithm. And, while there are methods to let Google know that you want to remove duplicate content from the former URL, the methods involve adding canonical tags (code) to the pages on the URL. Without access to the URL, there is no way to add the canonical tags needed to inform Google that the previous URL and its content should be considered duplicate content. Reference link: https://developers.google.com/search/docs/advanced/guidelines/duplicate-content  In addition, there is no guarantee that a new URL with the same website will ever get to the same level of traffic as the previous URL. A conservative estimate for legal industry Search Optimized copy writing costs (with a bulk discount price and factoring in that they might have a starting copy to work from) to rewrite 132 pages of content would be: $350 per page or $46,200. Website development costs to move 132 copies back into the existing website would be: $100 per page or $13,200. Costs to update the search engine optimization backend settings and code, including meta descriptions, title tags and URLs, and send Google to recrawl and index all 132 pages: $120 per page or $15,840. Prior to the incident yifeihelaw.com had 133 valuable referring domains linking back to the website and thousands of individual backlinks. Total cost to recreate 133 initial backlinks

at $500 each would be $66,500. Therefore, the total cost to recreate the site to give the best opportunity to regain the previous URL's search engine rankings on a new URL: **$141,740**. To recreate and relaunch a 132-page website on a new URL, as outlined above, it would involve the following steps and timeline: 1. A 15-page site would be put in place on a new URL. The site would include the website pages necessary to maintain a flow of business into each of the primary categories of the business while the remaining 117 pages are being written, search optimized and created. 2. At this point, a paid ad campaign could be put in place to drive traffic into the website while the remainder of the site copy is written and relaunched. 3. To write copy for the remaining 117 pages and recreate the site to where it was before the URL was lost it would take: 3 hours to write each new page and 1 hour to add the page to the site and search optimize the new page, 4 hours total per new website page. With 132 pages to add, it would take 528 hours of work to recreate the previous content and website on the new URL. It would likely take at least one year to recreate the previous website. Even after the site is recreated, it takes a minimum of six months (conservative estimate) for all of the new website copy to rank and get indexed in Google's search results pages and start to drive in traffic (again no guarantees that they'd reach the same position as it had previously). At a minimum, it would take YHE PLLC 18 months to get back to its previous traffic. Using the $4,000 monthly click value that the previous URL's SEO traffic had in November 2023, a conservative cost to purchase similar traffic through keyword advertising while the new website is gaining search presence, would be: **$72,000**.

b. Loss Revenue and Business Interruption Losses And Damages: As a result of Afternic's actions, YHE PLLC lost revenues and profits that it would have earned in the amount of

no less than **$232,953**. Additionally, YHE PLLC has lost approximately **$7,700** of annual revenue from prospective clients seeking paid consultations. The impact of Afternic's actions continue to be felt by YHE PLLC.

## COUNT II

### (Cybersquatting Under 15 U.S.C. § 1125(d) 105)

63.     Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

64.     In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA" or "Act"), 15 U.S.C.A. § 1125(d), to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners.

65.     15 U.S.C. 1125(d) provides:

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

66.     15 U.S.C. 1125 (d)(E) provides:

As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

16

67.     Accordingly, Congress enacted the ACPA to include not only individuals and companies who register domain names, but rather, to apply equally to three classes of persons/entities: (1) registrants of the Deceptive Domains; (2) anyone who "uses" the domain name which is defined as the registrant or the "authorized licensee" of the registrants of the Deceptive Domains; and (3) anyone who "traffics in" Deceptive Domains, which refers to anyone involved in any transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration, whether or not the person is the registrant of the Deceptive Domain.

68.      Congress drafted the ACPA to prevent the use, licensing, pledging, trafficking in, or any other exchange of consideration for the use of the Deceptive Domain Names. Afternic's conduct in monetizing the Infringing Deceptive Domain is the very conduct which Congress declared to be illegal.

69.     Afternic receives a twenty percent commission on every domain name it lists and transfers for sale and in this way, it uses domain names and monetizes those domain names it lists and transfers.

70.     By taking possession of a domain name, Afternic intentionally enabled the Indonesian gambling entity to infringe on YHE PLLC's mark.

71.     Afternic had bad faith intent to profit which is evidenced by the following allegations in addition to the above, incorporated by reference, allegations.

72.     Afternic acted as the authorized licensee of the registrant and used the Infringing Deceptive Domain in violation of the ACPA.

73.     Afternic violated its own policies by selling YHE PLLC's domain name to an Indonesian gambling site because gambling, upon information and belief, is illegal in Indonesia.

74.     Afternic had no property rights to YHE PLLC's domain name. Afternic intended to, and did, divert consumers from YHE PLLC's website in a way that did harm the goodwill of YHE PLLC's domain name and did cause confusion.

75.     Afternic has refused to disclose the name or owner of the Indonesian gambling site.

76.     yifeihelaw.com was a distinctive, famous, venerable, valuable mark at the time Afternic trafficked in, or acted as the authorized licensee of a registrant and used the Infringing Deceptive Domain.

77.     The Infringing Deceptive Domain is identical to the Distinctive and Valuable Mark.

78.     Afternic does not have any intellectual property rights or any other rights in the Distinctive and Valuable Mark.

79.     The Infringing Deceptive Domain consists of the legal name of YHE PLLC, or a name that is otherwise commonly used to identify YHE PLLC.

80.     Afternic has never made any prior use of the Infringing Deceptive Domain in connection with the bona fide offering of any goods or services.

81.     Afternic trafficked in and/or used the Infringing Deceptive Domain to divert consumers from Plaintiff's websites to a website accessible from the Infringing Deceptive Domain.

82.     Afternic thereby created a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Infringing Deceptive Domain website.

83.     Afternic offered to transfer, sell, or otherwise assign the Infringing Deceptive Domain for financial gain without having used, or having the intent to use, the Infringing Deceptive Domain in the bona fide offering of any goods or services.

84.     Afternic has used, trafficked in, and/or acted as the registrant's authorized licensee in the Infringing Deceptive Domain which it knew was identical or confusingly similar to the protected and Distinctive and Valuable Mark, which was distinctive at the time of the registration and continues to be distinctive.

85.     Afternic's trafficking in, and/or use, as the authorized licensee of the registrant, of the Infringing Deceptive Domain constitutes cybersquatting in violation of 15 U.S.C. § 1125(d). Afternic's acts as alleged herein constitute the use of and trafficking in the Infringing Deceptive Domain, in violation of the ACPA with bad faith intent to profit from YHE PLLC's Distinctive and Valuable Mark.

86.     Afternic's acts as alleged herein constitute cyberpiracy, cybersquatting, and/or typo squatting, in violation of the ACPA.

87.     Afternic was not acting as a registrar and thus there is no statutory safe harbor available to it. Further, the statute was not intended to shield registrars from liability for actions outside their core function as registrars.

88.     By reason of Afternic's acts alleged herein, a remedy at law is not adequate to compensate YHE PLLC for the injuries inflicted by Afternic. Accordingly, YHE PLLC is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

89.     By reason of Afternic's acts alleged herein, YHE PLLC is entitled to recover Afternic's profits, actual damages, and the costs of the action, or, on YHE PLLC's election,

statutory damages under 15 U.S.C. § 1117, in an amount up to One Hundred Thousand Dollars ($100,000) per Deceptive Domain name infringement.

90.     Further, this is an exceptional case making YHE PLLC eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

COUNT III
(Conversion)

91.     Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

92.     Afternic intentionally or wrongfully exercised acts of ownership, control or dominion over property to which it had no right of possession.

93.     Conversion of so-called "intangible property" has been recognized in the Superior Court of Massachusetts but has not yet been decided either by the SJC or the First Circuit. In addition, the intangible property at issue resided with a tangible item, including without limitation, YHE PLLC's computer storage device, on which its ideas and expressions were stored. Thus, the tort of conversion in this case applies to the property's tangible incarnations.

94.     Despite demand, Afternic has refused to return YHE PLLC's domain name.

95.     Plaintiff has been injured as a result of Defendant's conversion.

COUNT IV
(Chapter 93A)

96.     Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

97.     By virtue of the foregoing, Afternic knowingly and intentionally engaged, and continues to engage, in unfair and deceptive acts and practices in violation of Mass. Gen. Laws Chapter 93A, Section 11, including, but not limited to, the following:

- Afternic without any agreement or authorization did convert and misappropriate YHE PLLC's domain name and sold the domain name for its own profit.

- After demand was made for the return of YHE PLLC's domain name, Afternic did nothing, and instead continues to threaten YHE PLLC if YHE PLLC does not accept the funds for the unauthorized sale of its domain name.

- Afternic promised it would investigate, but it did not and if it did investigate refused to inform YHE PLLC of the results of any investigation which is a violation of ICANN.

- Upon demand for information as to how and why this occurred, Afternic falsely claimed YHE PLLC listed its domain name for sale.

- When asked for proof, Afternic in the course of its business supplied false information in an attempt to convince YHE PLLC that it listed its domain name for sale.

- When pressed for answers, Afternic, despite having a duty to be honest, engaged in a pattern of silence and of false and misleading statements in an effort to hide the truth from YHE PLLC.

- The described conduct constitutes unfair methods of competition and/or unfair and deceptive acts or practices in violation of Chapter 93A and falls well within the factors articulated in *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593 (1975): (1) whether the conduct is within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers' or other businesses."

98.     Afternic's conduct took place in a commercial setting and occurred primarily and substantially within the Commonwealth of Massachusetts, where Afternic is located.

99.    The conversion and misappropriation occurred in Massachusetts.

100.    The false statements and false promises were made in and/or received in Massachusetts.

101.    YHE PLLC suffered substantial injury in Massachusetts.

JURY DEMAND

The Plaintiff requests a trial by jury on all claims.

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

1.    All damages to which Plaintiff is entitled in an amount not less than **$454,393.00**.

2.    Injunctive and/or other equitable relief;

3.    Attorney fees, costs, and interest;

4.    Treble Damages in the amount of not less than $**1,364,179.00**; and

5.    Such other and further relief as the court may deem just and proper.

Respectfully submitted by the Plaintiff, The Law Office of Yifei He, PLLC,

By its attorneys,

/s/ Yifei He

Yifei He, Esq.
BBO # 686999
yifeihe.esq@gmail.com
The Law Office of Yifei He PLLC
32 Broadway Suite 1710
New York NY 10004

DATED: March 5, 2025